MRS. IDA LANCASTER v. ATLANTIC GREYHOUND CORPORATION.
(Filed 31 May, 1941.)

**1. Courts § 13—**

In an action instituted in this State involving the rights and liabilities of the parties arising out of an automobile collision occurring in South Carolina, the laws of South Carolina control except as to matters of procedure.

**2. Automobiles § 9a—**

The common law rule of the ordinary prudent man prevails in the operation of motor vehicles, the rule not being made obsolete but rather preserved in statutory traffic regulations, and even a technical violation of statute or ordinance may be required under circumstances in which a reasonably prudent man can foresee that injury would likely result from a strict compliance with the regulations.

**3. Negligence § 9a—**

In order for negligence to constitute the proximate cause of injury it is not required that the particular injury which resulted should have been foreseeable, it being sufficient if, under the circumstances, a reasonably prudent man could have foreseen that some injury would probably result.

**4. Negligence § 7—**

Active negligence which continues to the moment of injury can rarely be insulated by intervening negligence, since if it is a substantial contributing factor to the injury it becomes the proximate cause or one of the proximate causes thereof.

**5. Automobiles § 18d—Evidence held insufficient to show intervening negligence on part of third party insulating as matter of law negligence of defendant.**

The accident in suit occurred in South Carolina. Plaintiff was a passenger for hire in a taxicab furnished by defendant. The evidence tended to show that the cab entered a street intersection which was heavily congested with traffic at a speed of 18 to 24 miles per hour, that a van was standing on the right side of the street near the center waiting an opportunity to make a left turn, that the cab passed to the right of the van, and that as it cleared the front of the van it was struck by a truck which had approached the intersection from the opposite direction and was attempting to make a left turn. A statute of the State of South Carolina was introduced in evidence which provided that in making a left turn a vehicle should give right of way to other vehicles in the intersection or so close thereto as to constitute an immediate hazard, but that having done so, vehicles approaching the intersection from the opposite direction should yield the right of way to it. *Held:* Even conceding that a jury might

find from the evidence that the driver of the truck was negligent, left turns at the intersection were permitted, and his act in turning in front of the cab was not unforeseeable and cannot be held as a matter of law to insulate the negligence of the driver of the cab in entering the intersection when his vision was partially obstructed by the standing van at a speed inconsistent with due care under the circumstances in violation of statutory regulations of the State of South Carolina and in violation of the rule of the ordinary prudent man.

APPEAL by defendant from *Rousseau, J.,* at February Term, 1941, of FORSYTH. No error.

This is an action to recover damages for an injury sustained by plaintiff through the alleged negligence of defendant in the operation of a taxicab by its servant and agent in the city of Anderson, South Carolina.

Evidence of the plaintiff tends to show that she purchased a ticket and became a passenger on defendant's bus in Winston-Salem, North Carolina, bound for Atlanta, Georgia. When the bus reached Anderson, as there was not room on the next scheduled bus, defendant employed a taxicab driver to transport plaintiff, with her daughter, and another passenger along the route until she could get room on the regular scheduled bus of defendant farther south, and plaintiff was transferred to this cab.

While still in Anderson the taxicab, following the bus, but separated from it some distance, came into collision with another motor vehicle at the intersection of South Main and River Streets, injuring plaintiff.

There is evidence to the effect that the bus driver had told the driver of the taxicab to "keep right up with him"; that the taxicab had been delayed for a short period by a red light, and the bus was "going on out of sight"; that the taxicab took off with great speed, jerking an occupant back on the seat, and that it was running between 30 to 35 miles an hour immediately preceding the collision.

C. H. Crane, the driver of the Chevrolet truck which was in collision with the taxicab, testified that he was going north on South Main Street, south of the intersection therewith of River Street. About 2½ blocks from the intersection he met a Greyhound bus headed south. He was driving on the right-hand side of the street as he approached the intersection of River Street. While about a block back he noticed a big van truck coming south, and started slowing up, and the van likewise slowed up, so that both the Chevrolet truck driven by witness and the van were almost stopped. The van driver signaled for a left-hand turn and so did the driver of the truck, whereupon the van driver signaled for a stop, and, accordingly, stopped. Witness pulled his car into low gear, turned over the "mushroom"—(a device or marker in the street to regulate traffic)—and proceeded to make the left-hand turn. Just as the front

end of his truck got around the front of the van, the left front wheel and fender of the taxicab struck the truck. Witness first saw the taxicab when it was five or six feet away. The taxicab was passing on the right side of the van. The collision was of such force as to bend the frame of the truck against the motor, turn the truck around and "head it back," the truck going a distance of 38 feet to the south sidewalk line of River Street.

The van was of the truck and trailer type, with a big body, longer than the taxicab and the truck, referred to frequently as "the big van." Witness estimated the speed of the taxicab as 40 miles an hour. The van was of such length that it could not have gone around the "mushroom" and got back into River Street. It was sitting a little to the right of the center of Main Street, and straight up and down the street. At that point Main Street is about 80 feet wide. The witness describes Main Street as being "the most important and the most traveled highway in the town of Anderson." River Street is about 36 feet wide on the east side of Main, and 26 feet wide on the west. The "mushroom" marker is not in the center of the intersection, but nearer the east side.

Albert Elrod, driver of the taxicab, as witness for defendant, testified that he saw the van stopped in Main Street a block before he came to it; the driver of the van was waiting for traffic to clear up so he could make a left turn. Traffic was meeting witness on the left. "The big moving van was sitting in the middle of the street. It was way up on the mushroom, waiting for a left turn. The bus and myself had to drive to the right. When the bus cleared the van, I went the same way he did. Then Mr. Crane made a sharp left turn and come between the Greyhound bus and me, and that made him hit me directly head-on." Witness stated Crane was running 20 to 25 miles an hour. On cross-examination, the witness said: "When I entered the intersection, I slowed down to about 18 miles an hour by lifting my foot off the accelerator. I am positive I slowed down to 18 miles an hour before I entered the intersection of River Street. I knew the speed law in South Carolina in a business district, which this was, is 25 miles per hour. I do not say for that reason I was not going faster than 25 miles an hour. I say it because I wasn't going any faster and that is my only reason. The fact it happens to be 25 doesn't affect anything. I saw this big van in the street half a block away and he was stopped. He remained stopped while I traveled half a block. I could not see his left turn signal from the right side of the moving van. I knew the van driver was signaling for a left turn. I knew what he was there for. I saw him holding his hand out the left door. I tell that jury I saw that. I did not pass on the left-hand side of the van. I saw him as I came up. He had the back of his truck pulled around for a left turn. You can't turn one of those trucks on a

dime. This van had not turned left before I approached it, but it had swung to the left. He was bearing to the left, standing still. His van was not straight in the street, but was at an angle. I saw the hand signal before we even got to the back of the van."

. . . "At the time I entered the intersection of River and Main Streets, the Greyhound bus was around a block ahead of me. I did not say Mr. Crane cut his truck immediately behind the bus. I said he came between the bus and me. When the bus went by, the next thing I saw was him coming across just like he come, head-on. He cut this corner at a left-hand angle and hit me. I did not say that was just as soon as the bus went by. I couldn't watch both things at once. I am trying to tell you about it, give me time. At the time he made his left turn, the bus was around almost a block away. Those are short blocks down there. I am counting from River Street to Reid Street; that is a short block with two houses in it."

J. B. Nicholson, a witness for defendant, testified:

"I saw an accident or collision between a Yellow Cab automobile and a Chevrolet truck at the intersection of River and·South Main Sts. on July 27, 1939. I was coming down South Main Street and at the traffic signal at the intersection of Market and Main Streets I had to stop on the red light there, and in the meantime this taxicab pulled up beside me. He was on the right and when the traffic light changed, I pulled off and he pulled off immediately after me. In other words, I was ahead of him.

"I worked on the corner there and was going back to work. I was to make a left-hand turn and pulled up behind this truck, and the cab went to my right and the right of the truck I was parked behind, and the collision occurred to the right in front of this big truck sitting there. This truck there in the street it was a big van and as far as I could see it was just what you might say was a short truck. It was a long truck, but wasn't a trailer truck. It was a single trailer. He was on the right side of the mushroom, pulled up almost against it. He was just to the right of it and his front end right at the mushroom."

. . . "I didn't see the Chevrolet truck before the collision, but just as it happened. It appeared to me it was coming up South Main Street going north and turned in front of the big truck. The truck was in front of me and I couldn't say whether he went to the right or left of the mushroom, but I don't see how he had room to go in front of it. The Yellow Cab was traveling 20 to 23 or 24 miles per hour. I would say the Chevrolet truck was traveling around 10 miles an hour."

"The big van had stopped when I pulled up behind it. I stopped behind it because I meant to make a left-hand turn. I had not seen his signal as to what direction he was going. That van was approximately

30 feet in length. I stopped the front end of my car some 8 to 10 feet of the rear of the van. That would put me some 48 to 50 feet north of the curb line of River Street. You couldn't see through or over the body of this van. It completely obstructed my view so far as my view. I saw the taxicab come by to my right. He was going 20 to 24 miles an hour. I understand the speed limit wasn't that much, and I wasn't breaking the speed limit and I was ahead of him. I understand the speed limit is more than 24 in that section."

. . . "He entered the intersection at 20 to 24 miles an hour. He did not slow down when he passed the van, but kept his speed. He kept his speed right on and he gradually passed me. I didn't see Mr. Crane's truck until the collision, just the flash of the collision. I could not see his truck because of the van."

The following laws of the State of South Carolina were introduced in evidence:

*"EXHIBIT A.*

"EXCERPTS FROM THE ACT OF THE GENERAL ASSEMBLY OF THE STATE OF SOUTH CAROLINA, ADOPTED ON THE 16th DAY OF APRIL, 1937, ENTITLED:

"An Act to Restrict and Limit the Use of Highways by Drivers and Pedestrians; to Regulate Traffic on Highways; to Define Certain Crimes in the Use and Operation of Vehicles; to Require Uniform and Safe Driving Practices; to Require Compulsory Accident Reports; and to Provide for Enforcement of this Act and Penalties for Violations.

"SECTION 1. Be it enacted by the General Assembly of the State of South Carolina: Definitions.—For the purpose of this Act, the following words, phrases, and terms are hereby defined as follows:

*"VEHICLE.* Every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, except devices moved by human power or used exclusively upon stationary rails or tracks.

*"MOTOR VEHICLE.* Every vehicle which is self-propelled and not operated or driven on fixed rails or tracks.

*"INTERSECTION.* The area embraced within the prolongation or connection of the lateral curb lines, or, if none, then the lateral boundary lines of the roadways of two highways which join one another at or approximately at, right angles, or the area within which vehicles traveling upon different highways, joining at any other angle may come in conflict.

*"BUSINESS DISTRICT.* The territory contiguous to and including a highway when 50 per cent or more of the frontage thereon for a distance of 300 feet or more is occupied by buildings in use for business.

*"RESIDENCE DISTRICT.* The territory contiguous to and including a highway not comprising a business district when the property on such highway for a distance of 300 feet or more is in the main improved with residences.

*"OFFICIAL TRAFFIC CONTROL DEVICES.* All signs, signals, markings, and devices not inconsistent with this Act placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning, or guiding traffic.

"SECTION 2. *SPEED RESTRICTIONS.* (a) No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing.

"(b) Where no special hazard exists the following speeds for passenger vehicles shall be lawful and any speed to excess of said limits shall be unlawful:

"1. Twenty-five miles per hour in any business district;

"2. Thirty-five miles per hour in any residence district;

"3. Fifty-five miles per hour under other conditions.

"(d). The fact that the speed of a vehicle is lower than the foregoing limits shall not relieve the driver from the duty to decrease speed when approaching and crossing an intersection, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding highway, or when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions, and speed shall be decreased as may be necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care.

"SECTION 8. *OVERTAKING A VEHICLE.* (a) The following shall govern the overtaking and passing of vehicles proceeding in the same direction:

"1. The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle."

The plaintiff introduced in evidence the following laws of South Carolina relating to the operation of motor vehicles:

"CHAPTER 175 OF THE MOTOR VEHICLE LAW OF SOUTH CAROLINA, the pertinent portions being as follows:

"Sec. 2. 'No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing. Where no special hazards exist, the following speeds for passenger vehicles shall be lawful and any speed in excess of said limits shall be unlawful:

" 'Twenty-five miles per hour in any business district.   . . .

" 'Where no special hazard exists the following speeds for motor trucks and motor truck tractors shall be lawful but any speed in excess of said limits shall be unlawful: Twenty miles per hour in any business district.   . . .

" 'The fact that the speed of a vehicle is lower than the foregoing limits shall not relieve the driver from the duty to decrease speed when approaching and crossing an intersection, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, or when special hazards exist with respect to pedestrians or other traffic or by reason of weather or highway conditions, and speed shall be decreased as may be necessary to avoid colliding with any person, vehicle or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care.'

"Sec. 8. 'Overtaking a vehicle on the right is permitted under the following conditions: The driver of a vehicle may overtake and pass upon the right of another which is making or about to make a left turn.'

"Sec. 13. 'Approach for a left turn shall be made in that portion of the right half of the roadway nearest the center line thereof and after entering the intersection, the left turn shall be made so as to leave the intersection to the right of the center line of the roadway being entered.'

"Sec. 16. 'When signals required. No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety and then only after giving a clearly audible signal by sounding the horn if any pedestrian may be affected by such move, or after giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement. A signal of intention to turn right or left shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning. The signals herein required shall be given either by means of the hand and arm or by a signal lamp or signal device of a type approved by the Department, but when a vehicle is so constructed or loaded that a hand or arm signal would not be visible both to the front and rear of such vehicle, then said signal must be given by such a lamp or device.'   . . .

"Sec. 20. 'The driver of a vehicle within an intersection intending to turn to the left shall yield the right of way to any vehicle approaching

from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, but such driver having so yielded and having given the signal when and as required by this Act, may make such left turn and the drivers of all other vehicles approaching the intersection from said opposite direction shall yield the right of way to the vehicle making the left turn.' "

The defendant, in apt time, made motions for judgment as of nonsuit, which were overruled, and defendant excepted.

Issues were submitted on the questions of negligence, and damage, and answered in favor of plaintiff. Judgment for plaintiff ensued, and defendant, having made exceptions preserving the right of review, appealed, assigning error.

*Roy L. Deal for plaintiff, appellee.*
*Fred S. Hutchins and H. Bryce Parker for defendant, appellant.*

SEAWELL, J. This appeal presents one question: Should the trial court have allowed defendant's motion for judgment as of nonsuit?

The injury to plaintiff occurred in the State of South Carolina from causes operating in that State, and, except for procedural law of the forum not here challenged, the South Carolina law applies. *Howard v. Howard,* 200 N. C., 574, 158 S. E., 101; *Hipps v. R. R.,* 177 N. C., 472, 99 S. E. (S. C.), 18.

The vast development of travel and traffic by motor vehicles, greatly multiplying the dangers incident to the use of highways and streets, and the necessity of regulation looking to the safety of persons and property, have given rise to an astonishing volume of statutory law, all of which exhibits a sameness of trend but no uniformity of detail in the several states. These statutes frequently impose duties and create obligations unknown to the common law, but there are certain fundamentals of the common law relating to actionable negligence which may be said to persist and frequently to become deciding factors after giving applicable statutes their full effect.

The rule of "the ordinarily prudent man" as a measure of the duty one person owes to another, the violation of which gives rise to actionable tort, is fully recognized in South Carolina law, as indeed it is, with some differences of local interpretation and application, in every state in the Union. *Burnette v. Augusta Coca-Cola Bottling Co.,* 157 S. C., 359, 154 S. E., 645; *Anderson v. Ballenger,* 166 S. C., 44, 164 S. E., 313; *Barkshadt v. Gresham,* 120 S. C., 219, 112 S. E., 923; *King v. Holliday,* 116 S. C., 463, 108 S. E., 186. The principle is so strongly adhered to that it has been held that it is the duty of a person technically to violate

a statute or ordinance if to do so becomes necessary to avoid inflicting injury. *Walker v. Lee,* 115 S. C., 495, 106 S. E., 682; *Sims v. Eleazer,* 116 S. C., 41, 106 S. E., 854.

There is in the South Carolina laws introduced in the evidence an express, and we think, successful attempt to preserve this rule against purely mechanical reliance on the regulating statutes relating to the conduct of those approaching and using intersections where want of care is likely to result in injury.

While the testimony is conflicting, it can hardly be questioned that there is evidence from which the jury might infer negligence on the part of Elrod, the driver of defendant's taxicab, in approaching and entering the intersection at a speed inconsistent with due care; especially in view of the condition of traffic therein, the fact that it was a much used intersection, and that his view was partly obstructed by a large van partly within the intersection.

As we understand the argument of defendant, it is based more strongly on the contention that the evidence fails to show that any negligence of the defendant was proximately connected with the collision and injury. Counsel contend that the negligence of Crane, the driver of the Chevrolet truck, intervened and insulated the negligence of the taxicab driver, if such negligence existed, and that we should so find as a matter of law, notwithstanding the verdict of the jury, and cite numerous cases, mostly from this jurisdiction. *Butner v. Spease,* 217 N. C., 82, 6 S. E. (2d), 808; *Shirley v. Ayers,* 201 N. C., 51, 158 S. E., 840; *Guthrie v. Gocking,* 214 N. C., 513, 199 S. E., 707; *Hinnant v. R. R.,* 202 N. C., 489, 163 S. E., 555; *Lineberry v. R. R.,* 187 N. C., 786, 123 S. E., 1; *Beach v. Patton,* 208 N. C., 134, 179 S. E., 446, and other cases dealing with the subject. The citations considered of sufficient pertinency will be dealt with later.

If the defendant could base its theory of insulated negligence on clear and undisputed facts, showing the conduct of Crane, the driver of the Chevrolet truck, to have been of the character which defendant ascribes to it, the defense might be worthy of more serious consideration, but there are difficulties in the way. Under the conflicting evidence upon the critical point at issue, we do not feel justified in taking the extreme view of the occurrence necessary to sustain defendant's contention. It would involve an assumption of facts which the jury, on the whole evidence, has obviously found to be otherwise.

Indeed, we are unable to see how, as a matter of law, we might find that Crane, the driver of the Chevrolet truck, was negligent at all. It has not been called to our attention that he violated any South Carolina law that would render his conduct negligent *per se.* On the contrary, he had a right to make a left-hand turn into River Street through this

intersection which, operating from his line of travel on the right-hand side of the street, would carry him across the line of traffic going south on the west side of the street. In doing this, he must, of course, observe due care; but if his testimony is believed, he did everything the law required, not only to make his attempt lawful, but to give him the right of way. See "Section 20," *supra.* He signaled in apt time for a left turn, which gave him the right of way over vehicles not yet within the intersection, and then proceeded to make the turn in low gear. There was not apparent any "immediate hazard" of oncoming cars, since traffic had stopped upon his signal—except that the taxicab alone, with undiminished speed, entered the intersection and intercepted his truck. There are contradictions, of course, but that aspect of the evidence cannot be eliminated.

There is also contradiction of the defendant's view of the situation as to the time and manner in which Crane entered the intersection and made the turn, and the correlation of these elements with the movements of the taxicab.

But conceding Crane's negligence, his conduct lacked that extraordinariness necessary to withdraw it from the limits of foreseeability. Restatement of the Law, Torts, section 447. To incur liability for negligent conduct, it is not necessary that the person guilty of the negligence should foresee the exact nature of the occurrence or injury consequent upon his negligent act or omission. It is only necessary that he may foresee that some injury may reasonably follow as a consequence thereof. The negligence charged to defendant's agent, Elrod, is of a nature peculiarly significant of the obvious danger, which, in this instance, ripened into injury:—driving at a high rate of speed into a busy intersection occupied with traffic, with his vision partly obstructed. Under such circumstances it is usually seen that one who outruns his visual limitations has made a blind date with disaster. In what form it presents itself is immaterial to the issue.

The law upon the subject in this State has been expressed by *Justice Barnhill* in *Dunn v. Bomberger,* 213 N. C., 172, 177, 195 S. E., 364, as follows: "In order to establish actionable negligence the plaintiff must show that the defendant, in the exercise of ordinary care, could foresee that some injury would result from his alleged negligent act."

South Carolina decisions are even stronger: "The liability of a person charged with negligence does not depend on the question whether with the exercise of reasonable prudence, he could or ought to have foreseen the very injury complained of; but he may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his act or omission." *Washburn v. Laclede Gas Light Co.,* 202 Mo. App., 102, loc. cit. 115, 214 S. W., 410, 414, approved

in *Horne v. Southern R.*, 186 S. C., 525, 197 S. E., 31, and in *Tobias v. Carolina Power & Light Co.*, 190 S. C., 181, 186. "It is sufficient that in view of all the attendant circumstances, he should have foreseen that his negligence would probably result in injury of some kind to someone." *Tobias v. Carolina Power & Light Co.* (S. C.), *supra;* Restatement of the Law of Torts, Vol. 2, Negligence, p. 1173, section 435.

The situation dealt with in *Butner v. Spease, supra,* is so radically different from that presented in the present case as to distinguish the *Butner v. Spease* case in principle and to make it inapplicable here. Here we are dealing with the conduct of two drivers approaching, entering, and using a much used intersection in a populous town then occupied with traffic and with special, local, or state laws relating to the use of the intersection, and specifically the manner in which left-hand turns might be made and respected under the conditions then prevailing.

It should be said also that in *Beach v. Patton, supra, Justice Schenck,* who wrote the opinion for the Court, was dealing with a passive or inactive primary negligence which lends itself more readily to the doctrine of insulated negligence when active negligence has intervened. Instances in which active negligence, continuing to the moment of the impact, may be insulated by intervening negligence must be comparatively rare. Such primary negligence is never insulated when it is obviously a substantial contributing factor. No doctrine of whatsoever kind ought to be mechanically applied against the reason of the thing.

While the jury, if the issue had been before it, might have inferred from the evidence that Crane was negligent, the ultimate effect could have been no more than make him a joint *tort-feasor* with the defendant, and this, of course, would not alter the result of the trial.

We find

No error.